**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| BRAXTON CLARK, individually, on behalf of himself and all others similarly situated,<br><br>    *Plaintiff*,<br><br>    v.<br><br>REALPLAY TECH INC. and REALPLAY (EU) LTD,<br><br>    *Defendants*. | Case No._____ |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Braxton Clark ("Plaintiff"), individually and on behalf of all others similarly situated, hereby alleges the following against Defendants RealPlay Tech Inc. and RealPlay (EU) Ltd. (collectively, "Defendants"), based upon, *inter alia*, the investigation made by his counsel, and based upon information and belief, except as to those allegations and experiences specifically pertaining to Plaintiff which are based upon his personal knowledge.

### NATURE OF THE CASE

1.     This case arises out of Defendants' operation of an illegal online casino in violation of Illinois law.

2.     Defendants own and operate RealPrize (https://www.realprize.com/) ("RealPrize"), one of the most popular and profitable casino and sweepstakes gaming website on the planet.

3.     Through RealPrize, users can access and play thousands of popular casino games, including, *inter alia*, jackpots, slots, roulette, baccarat, and Megaways titles (the "Chance Games"). Some of these games are even hosted by live dealers in real-time, further mimicking the experience of a physical casino.

4.      The Chance Games offered on RealPrize are unequivocally games of chance. Their outcomes are determined primarily, if not exclusively, by randomization—rendering them indistinguishable from the games found in traditional, brick-and-mortar casinos.

5.      To evade regulatory scrutiny and mislead consumers, Defendants market RealPrize as a "social casino." This designation is purely cosmetic, designed to create the false impression that the platform provides benign, entertainment-only gameplay, when in reality it facilitates and profits from illegal gambling.

6.      In practice, RealPrize operates in a manner virtually indistinguishable from a traditional online casino. Players can purchase in-game currency, use that currency to wager on games of chance, and subsequently redeem their winnings for cash or gift cards. RealPrize's rapid growth and popularity are directly attributable to its realistic casino-like experience, which includes authentic gameplay, partnerships with well-known gaming studios, robust bonus programs, and fast, reliable payout systems.

7.      RealPrize derives its revenue primarily through the sale of in-game currency—specifically, virtual coins—which function as a de facto substitute for real money and are necessary for users to participate in games on the platform.

8.      The platform features two forms of virtual currency: "Gold Coins" and "Sweeps Coins." While Gold Coins are offered with promotional bonuses such as sign-up rewards and daily refills, they are marketed as having no real-world monetary value.

9.      However, RealPrize conceals the true nature of its business model. The purchase of Gold Coins is typically "bundled" with Sweeps Coins—another currency that **does** carry real-

world value.[1]

10.    Players use Sweeps Coins to enter sweepstakes-style games, which offer the chance to win cash or gift cards.

11.    After meeting a minimal 1x playthrough requirement and collecting at least 100 Sweeps Coins, players can redeem them for cash prizes. Alternatively, with a minimum of 45 Sweeps Coins, players can redeem them for gift cards. In effect, players are wagering a valuable currency (Sweeps Coins) on games of chance in order to obtain prizes of greater value—a textbook definition of gambling.

12.    The structure and pricing of RealPrize's virtual currency offerings make clear that the platform's true aim is to facilitate and profit from the sale of Sweeps Coins. Despite nominal distinctions between the two types of currency, the underlying games are purely games of chance; they require little to no skill to determine the outcome.

13.    Virtual gambling is highly addictive. Moreover, under Illinois law, gambling is strictly regulated. The state's regulatory framework mandates that such games may only be offered by licensed operators at approved physical locations. RealPrize's operations flout these legal requirements by providing unlicensed gambling services to Illinois residents via the internet.

14.    Plaintiff, individually and on behalf of all other similarly situated, seeks all available remedies at law and equity, including damages, restitution, declaratory, and injunctive relief.

## **PARTIES**

15.    At all times material hereto, Plaintiff Braxton Clark has been and is a citizen of,

---

[1] According to player reviews, RealPrize's most enticing feature is its significant bonus bundle. https://sweepskings.com/reviews/realprize/ (last accessed October 10, 2025).  Upon registration, new users generally receive 100,000 Gold Coins and 2 Sweeps Coins. *Id.*

and domiciled in, Tamaroa, Illinois.

16.    Defendant RealPlay Tech, Inc. is a corporation existing and organized under the laws of Delaware, with its headquarters and principal place of business in Delaware. Defendant owns and operates a gambling website (available at https://www.RealPrize.us/) and app under the brand "RealPrize Casino." Defendant conducts business within the venue of this District and throughout Illinois generally, which website, apps and operations are not permitted and are illegal under Illinois law.

17.    Defendant RealPlay (EU), Ltd. is a foreign corporation existing and organized under the laws of Gibraltar, with its headquarters and principal place of business in Gibraltar. Defendant owns and operates a gambling website (available at https://www.RealPrize.us/) and app under the brand "RealPrize Casino." Defendant conducts business within the venue of this District and throughout Illinois generally, which website, apps and operations are not permitted and are illegal under Illinois law.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Class is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

19.    This Court has personal jurisdiction over Defendants because, as further described below, Defendants continuously and systematically conduct business and are authorized to conduct business here. Defendants sell its products to consumers in Illinois, including to Plaintiff.

20.    Moreover, Defendants actively disseminate targeted advertisements within the state with the intent of promoting and selling their products and services to consumers there. As such,

Defendants do business with sufficient minimum contacts in Illinois, and/or otherwise intentionally avail themselves of the Illinois market.

21.    Defendants have purposefully directed their activities toward this District.

22.    Defendants have purposefully availed themselves of the privileges of conducting activities in this District.

23.    Plaintiff's claims arise out of and relates to Defendants' forum-related activities.

24.    The exercise of jurisdiction over Defendants is reasonable.

25.    Upon information and belief, Defendants localizes its game for each market where it is distributed, including the United States. This localization includes changes to the language and currency presented in RealPrize.

26.    Upon information and belief, Defendants have sold millions of dollars of virtual items to thousands of Illinois residents, most of which are repeat purchases by the same customers, by contracting with the customers to sell virtual coins and other goods in exchange for legal tender.

27.    RealPrize facilitates ongoing economic activity between thousands of Illinois players and Defendants.

28.    Upon information and belief, Defendants directly control whether consumers in Illinois can complete purchases from RealPrize.

29.    Upon information and belief, Defendants have the capability to determine where their customers are from, including whether purchases are being made from Illinois.

30.    Upon information and belief, Defendants have the capability to prevent Illinois residents from completing purchases or placing wagers in RealPrize, but has chosen to accept those purchases and wagers from Illinois residents. For example, other gambling applications prevent transactions from residents of states where gambling is unlawful.

31.     Upon information and belief, Defendants have taken no steps to restrict Illinois residents' access to RealPrize or to restrict the ability of Illinois residents to make purchases from RealPrize.

32.     Upon information and belief, Defendants distribute its RealPrize app, in part, via the Apple app store and Google play store.

33.     Upon information and belief, in order to distribute RealPrize via the Apple app store and Google play store, Defendants entered into a developer agreement with Apple and Google.

34.     Upon information and belief, these advertisements for RealPrize were designed and directed to attract consumers in the United States, including this District, to play RealPrize.

35.     Upon information and belief, Defendants have the capability of targeting its RealPrize advertisements by geography and the capability of excluding residents of Illinois from the reach of Defendants' advertisements for RealPrize.

36.     Upon information and belief, Defendants partner with Meta Platforms, Inc., to serve targeted online ads at users of other companies' websites, games and online services. Upon information and belief, these ads are targeted at players that Defendants identified as potentially interested in RealPrize, including residents of Illinois. Upon information and belief, Defendants utilize unique device identifiers and Google Advertising ID and IP addresses in connection with these targeted ads. This information allows Defendants to identify the geographic location of its ad targets, including whether they are in Illinois.

37.     Upon information and belief, Defendants have taken no steps to restrict their advertisements for RealPrize from reaching residents of Illinois.

38.     Upon information and belief, in addition to Apple and Google, Defendants have entered into development agreements with Amazon for the distribution of RealPrize app, which

has offices in Illinois. Upon information and belief, under each of those agreements, Defendants have accepted responsibility for the compliance of RealPrize with federal and state laws, including those of Illinois.

39.     Venue is proper in this District under the provision of 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District. All of Plaintiff's activities and losses in RealPrize occurred in this District.

40.     Plaintiff alleges, upon information and belief, that Defendants conduct professional and commercial activities in Illinois on a substantial, continuous, and systematic basis and therefore Defendants are subject to the general jurisdiction of the courts of this state.

41.     Plaintiff further alleges, upon information and belief, that the claims asserted in this complaint arise out of or are related to each of the Defendants' professional and commercial activities within Illinois, and therefore the Defendants are subject to the specific jurisdiction of the courts of this state.

42.     The amount in controversy exceeds the jurisdictional minimum of this Court.

## FACTUAL BACKGROUND AND COMMON ALLEGATIONS

### I.     *The Problem of Online Gambling*

43.     Gambling addiction in the United States has escalated into a significant public health crisis, fueled by the rapid expansion of online casinos and sports betting platforms, including so called "social casinos."

44.     Since the Supreme Court's 2018 decision to legalize sports betting, the number of states with legal sportsbooks has surged from 1 to 38, with total sports wagers increasing from

$4.9 billion in 2017 to $121.1 billion in 2023.[2] This proliferation has been accompanied by a dramatic rise in gambling addiction cases.[3]

45.     Approximately 2.5 million adults in the U.S. suffer from severe gambling problems, while an additional five to eight million experiencing significant issues.[4] Alarmingly, individuals with gambling disorders are 15 times more likely to commit suicide than the general population.[5]

46.     Between 2018 and 2021, the Nation Council on Problem Gambling (NCPG) estimated that the risk of gambling addiction grew by 30%. NCPG has also seen significant increases in calls, texts and chats to the National Problem Gambling Helpline—roughly a 45% increase in calls between 2021 and 2022.[6]

47.     Further, internet searches for help with gambling addiction, such as "am I addicted to gambling", have cumulatively increased 23% nationally since *Murphy v. NCAA* through June 2024. This corresponds with approximately 6.5 to 7.3 million searches for gambling addiction help-seeking nationally, with 180,000 monthly searches at its peak.[7]

48.     The surge in gambling addiction is particularly pronounced among young men, with 10% exhibiting behaviors indicative of gambling addiction, compared to 3% of the general

---

[2]  https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting? (last accessed October 10, 2025).

[3] *See id*.
[4]  https://news.harvard.edu/gazette/story/2025/01/online-gambling-is-on-the-rise-panel-says-we-need-to-act-now/#:~:text=The%20National%20Council%20on%20Problem%20Gambling%20estimates%20that%20about%202.5,of%20callers%20is%20skewing%20younger. (last accessed October 10, 2025).
[5]https://www.who.int/news-room/fact-sheets/detail/gambling#:~:text=A%20Swedish%20study%20estimated%20that,the%20general%20population%20(4) (last accessed October 10, 2025).
[6]https://www.ncpgambling.org/news/ncpg-statement-on-the-betting-on-our-future-act/        (last accessed October 10, 2025).
[7]  https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting? (last accessed October 10, 2025).

population.[8] Online platforms, including social casinos, have been identified as significant contributors to this trend. These platforms often employ addictive design features, such as near-miss outcomes, fake limited-time sales, and variable reinforcement, to keep users engaged.

49.     The addiction and fallout related thereto is not limited to gamblers. It has a ripple effect that negatively impacts spouses, partners, children, and employers. Moreover, despite the growing prevalence of gambling addiction, funding for treatment remains insufficient.

50.     In Illinois, it is illegal to operate and offer online gambling casinos, including websites that offer slot machines, blackjack, roulette, and poker. *See generally* 720 ILCS 5/28-1(a)(12) *et. seq.* In this regard, Illinois has a fundamental and deep-rooted public policy against gambling.

51.     Despite Illinois' clear prohibition on online gambling, Defendants operate unlicensed and illegal online casinos within Illinois, as discussed further below.

## II.     *Defendants Use Free "Social Gaming" as a Pretext for Real, Online Gambling.*

52.     RealPrize advertises itself as a "social casino" website to avoid gambling regulations and reassure potential players that it offers casino-style games purely for entertainment, without real-money stakes. RealPrize claims it is a "free" play casino. RealPrize prominently represents that its casino games "**ARE NOT 'REAL MONEY GAMBLING.'**" (emphasis in original). However, this representation is false and misleading. In practice, RealPrize enables users to engage in real-money gambling through its system of Sweeps Coins, deceiving consumers into believing they are participating in harmless gameplay when, in fact, they are wagering something of value for the chance to win tangible prizes.

53.     The RealPrize platform offers a wide variety of casino-style games, including

---

[8] https://apnews.com/article/sports-betting-compulsive-gambling-addiction-d4d0b7a8465e5be0b451b115cab0fb15 (last accessed October 10, 2025).

digital slot machines, blackjack, poker, roulette, and lottery-style wheels. Through these games, Defendants provide users the opportunity to win sweepstakes prizes by accumulating and redeeming so-called Sweeps Coins. Here is an example of one of its games:



54.    Users can access RealPrize via its website or through mobile applications available on the Apple App Store and Google Play Store for download by users throughout the United States, including in Illinois.

55.    Upon accessing the platform, users are presented with an array of casino-style games, prominently including slots, roulette, poker, and blackjack.

56.    Once a user selects a game, players must select their play mode (either Gold Coins or Sweeps Coins) by clicking the option in the top-right menu of the website. An example of this option may be seen here:

57.    In the illustration above, RealPrize makes it easy to switch between wagering Gold Coins and Sweeps Coins. This simple mechanism is designed to make it as convenient as possible for players to transition to gambling with real-world stakes. Players who start out having fun can quickly and effortlessly shift to risking actual money without fully appreciating the financial consequences.

58.    After selecting their game, players then place their wagers by selecting the amount of Gold Coins or Sweeps Coins they wish to stake per round or spin. Depending on the outcome of the game, players may win additional coins, functioning in the same manner as traditional gambling wagers.

59.    In addition to automated games, RealPrize also offers a "live casino" feature, where users play games like blackjack and roulette with live human dealers who are visible through webcam streams, closely mimicking the experience of a physical casino.



60.     The games of chance offered in RealPrize —including slots, blackjack, and roulette—constitute gambling. These games are functionally identical to those offered in traditional casinos such as those in Las Vegas.

61.     When consumers first visit the RealPrize platform, they are provided with a quantity of free Gold Coins. Additional Gold Coins may be obtained through promotional giveaways and other marketing efforts.

62.     Consumers also use Sweeps Coins to play games on the platform. Unlike Gold Coins, Sweeps Coins are redeemable for cash and gift cards. Upon information and belief, each Sweeps Coin is equal in value to $1 USD in prizes, rendering Sweeps Coins a proxy for real money.

63.     Plaintiff and, upon information and belief, the vast majority of players on the RealPrize platform regularly buy additional coin bundles when they run out of Sweeps Coins even when they already possess unused Gold Coins. The fact that players are making these repeated purchases when they have ample Gold Coins confirm that these transactions are driven entirely by the desire to obtain Sweeps Coins for real-money gambling, rather than for the Gold Coins that Defendants sell.

64.     Users may acquire Sweeps Coins through the purchase of Gold Coins. The more

Gold Coins a user buys, the more Sweeps Coins they receive as an alleged "bonus." In reality, Defendants use the sale of Gold Coins as a vehicle for the sale of Sweeps Coins, misleadingly marketing the transaction to obscure the real-money nature of the exchange. The illustration below shows how coins are displayed in the store:



65.    Once obtained, users gamble with Sweeps Coins in the same manner as they do with Gold Coins. However, because Sweeps Coins are redeemable for real-world value, users who wager Sweeps Coins are engaging in gambling: staking something of value on an event determined predominantly by chance with the expectation of winning additional value in the form of redeemable prizes.

66.    Further, Defendants impose a "1x playthrough" requirement on bonus Sweeps Coins, mandating that players must wager an amount equal to the number of bonus Sweeps Coins they wish to withdraw before any redemption is permitted. For example, to withdraw 25 Sweeps Coins, a player must first wager at least 25 Sweeps Coins on casino-style games offered through

the RealPrize platform. This restrictive condition significantly impairs users' ability to redeem winnings and effectively forces continued gambling activity. The playthrough requirement operates as a coercive mechanism, compelling users to risk further losses under the guise of accessing previously earned rewards. This practice is misleading, particularly when users are initially lured to the platform by representations that it is merely a "social casino" offering free-to-play entertainment. In reality, the platform's design systematically incentivizes and prolongs gambling behavior while obscuring the difficulty of actually obtaining monetary rewards—underscoring the predatory nature of Defendants' operations.

67.    Illinois Statute §§ 720 ILCS 5/28-2(a) broadly defines a "gambling device" as "any clock, tape machine, slot machine or other machines or device for the reception of money or other thing of value on chance or skill or upon the action of which money or other thing of value is staked, hazarded, bet, won, or lost; or any mechanism, furniture, fixture, equipment, or other device designed primarily for use in a gambling place."

68.    Users of RealPrize stake or risk something of value when playing the games of chance offered on Defendants' platform. Specifically, players use Gold Coins or Sweeps Coins to participate in various casino-style games, the outcomes of which are determined predominantly by chance rather than skill. When using Sweeps Coins, players risk these digital tokens in hopes of winning additional Sweeps Coins, which may then be redeemed for cash or other real-world prizes. If the player wins, they retain or increase the number of coins wagered; if they lose, the coins are forfeited. This dynamic is materially distinct from traditional video games, where in-game currency is expended as a fee to play, irrespective of win or loss. In contrast, RealPrize mirrors the fundamental mechanics of real-money gambling, in which players risk a valuable consideration for the opportunity to win additional value.

69.     While some user interaction is involved, the outcomes of RealPrize's games are overwhelmingly determined by chance. Games such as digital slots, roulette, and lottery-style spins rely on random number generators or similar chance-based algorithms. Upon information and belief, the results of these games are not influenced by any player skill or decision-making, but are driven entirely by software that introduces randomness. As such, the element of chance predominates in determining game outcomes.

70.     The absence of skill components further emphasizes RealPrize's reliance on chance. Games commonly recognized as gambling, such as blackjack, craps, and interactive slot machines, incorporate some player decisions or interactivity. Therefore, the limited degree of user interaction does not remove RealPrize's games from the definition of a "game of chance" or "contest of chance" under Illinois law. RealPrize closely resembles so-called "I-Slots" (interactive slot machines), which allow limited user choice but are still fundamentally games of chance.

71.     Even players with significant experience or familiarity with casino-style games can lose repeatedly if the game's randomizing mechanism is not favorable. Conversely, novice or inexperienced users may win if the randomized outcome happens to align in their favor. This inherent unpredictability underscores that the dominant factor in the outcome of each game is chance—not skill, strategy, or experience.

72.     Gold Coins and Sweeps Coins constitute things of value under Illinois law and other applicable gambling statutes. These coins provide players with access to services, entertainment, and the privilege of continued gameplay without charge. Sweeps Coins, in particular, function as a "representative of value" because they are redeemable for real-world prizes, including cash and gift cards.

73.     The casino-style games on RealPrize closely mimic the experience of traditional

gambling establishments. These games feature audiovisual elements—including slot machine graphics, sounds, animations, and game mechanics—that replicate the look and feel of real-world casino games, further blurring the line between entertainment and gambling.

74.     In sum, Defendants' RealPrize casino platforms host casino-style games that are unmistakably games of chance. By offering these games of chance, Defendants are operating unregulated online casinos in violation of Illinois law, which explicitly prohibits gambling on games of chance conducted over the internet. 720 ILCS 5/28-1(a)(12).

### III.     *Defendants Resurrect Internet Sweepstakes Café Model from Early 2000s*

75.     In the early 2000s, a widespread trend emerged in which unscrupulous operators attempted to circumvent state gambling laws by establishing so-called "Internet cafés." These businesses—often set up in suburban strip malls—purported to sell innocuous products such as internet access or long-distance calling minutes. In reality, the purchase of those goods was merely a front for what amounted to casino-style gambling: customers received "free" sweepstakes entries with each purchase, which they could then use to play slot machine-style games on computer terminals, with the chance to win real cash prizes.

76.     Most state gambling statutes define gambling as involving three core elements: (1) consideration**,** (2) chance**,** and (3) a prize. Operators of these Internet cafés attempted to sidestep the "consideration" element by claiming that the sweepstakes entries were promotional add-ons to legitimate purchases, akin to promotional sweepstakes run by brands like large brands. But this separation was illusory; the primary and intended purpose of the transaction was to enable gambling.

77.     Courts and law enforcement agencies across the United States uniformly concluded that these so-called sweepstakes promotions were thinly veiled gambling operations, and moved

to shut them down under applicable state gambling laws.

78.    In *Windy City Promotions, LLC v. Illinois Gaming Board*, 87 N.E.3d 915 (Ill. App. Ct. 2017), the Illinois Appellate Court firmly rejected a familiar tactic used to sidestep gambling laws. There, the plaintiffs operated electronic kiosks that dispensed coupons in exchange for cash and entered users into sweepstakes games that mimicked slots and poker. *See id.* at 917. Plaintiffs contended that their devices were not gambling machines because consumers were ostensibly purchasing promotional coupons and not paying for the chance to win. *See id.* at 918. The court found this distinction unavailing, concluding that the kiosks violated Illinois gambling law, as the devices offered a chance to win a prize in exchange for consideration, meeting the statutory definition of illegal gambling regardless of how the transaction was framed. *Id.*

79.    *Windy City Promotions* reflects a broad consensus among courts nationwide: the use of nominal product sales or alternative free-entry routes does not shield operators from liability when the dominant purpose of the enterprise is gambling. The underlying structure—consideration exchanged for a chance to win a prize through a game of chance—remains unchanged and unlawful.

80.    RealPrize now attempts to revive this discredited model. Defendants will urge the Court to accept the fiction that its operations are not gambling, but rather legal "sweepstakes" entertainment. That argument is not new—it is the same tactic employed by illegal gambling outfits in the early 2000s, which courts and regulators uniformly rejected.

81.    As detailed herein, RealPrize employs a structurally identical business model: users ostensibly purchase "virtual coins" but receive "Sweeps Coins"—with real-world value—for use in casino-style games of chance. The inclusion of token "free" methods of entry and the marketing language around "sweepstakes" do not change the underlying legal reality. Courts have

17

consistently found such models to be unlawful.

82.     Indeed, in *Larsen v. PTT, LLC*, 737 F. Supp. 3d 1076 (W.D. Wash. 2024), a federal court granted summary judgment against an online gaming operator whose structure mirrored RealPrize's.

83.     Defendants' attempt to rebrand illegal online gambling as a sweepstakes promotion is part of a familiar pattern already discredited by courts, regulators, and the public. RealPrize's operations are not novel—they are a modern replica of a failed and unlawful model.

84.     The harm caused by RealPrize's illegal gambling operation is further exacerbated by its lack of accountability and regulatory oversight. Unlike licensed casinos, which must comply with strict requirements to ensure fairness, transparency, and consumer protections, Defendants operate without these safeguards. The absence of oversight leaves players vulnerable to unfair practices, such as manipulated game outcomes, misleading promotions, and nonexistent or inadequate mechanisms to address problem gambling.

85.     Indeed, Defendants' online casinos actively undermine critical consumer protections required by Illinois law. For example, Defendants disregard the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the Illinois Gaming Board Self-Exclusion Program. *See* 230 ILCS 10/13.1(a) (Compulsive gambling) ("Each licensed owner shall post signs with a statement regarding obtaining assistance with gambling problems" at "[e]ach entrance and exit" and "[n]ear each credit location."); 11 ILL. ADMIN. CODE 1800.1750.

## IV.    *All Purported Contracts with Defendants Are Void*

86.     There are two independent and legally sufficient grounds upon which any purported contract with Defendants is void and unenforceable.

87.     In Illinois, all contracts based wholly or partly on money or value obtained through illegal gambling is void.  § 720 ILCS 5/28-7.

88.     Thus, no contract was ever formed between the parties, and any purported contract between himself and Defendants, and any contractually based defenses Defendants may raise are likewise void.

89.     And the *entire* contract is void, because "all promises, contracts or agreements entered into, where the whole or any part of the consideration shall be for any money, property or other valuable thing won by any gaming, shall be void and of no effect." *Riordon v. McCabe*, 341 Ill. 506, 509, 173 N.E. 660, 662 (1930).

90.     Even if not void, they are unconscionable as the terms and conditions is an adhesion contract.

91.     Parties cannot contractually agree to engage in conduct that is criminal or otherwise contrary to public policy. Just as a person cannot lawfully contract to engage in forced labor, sex trafficking, illicit drug sales, or other illegal conduct, neither can they enter into a valid and enforceable agreement to participate in unlawful gambling. Any purported contractual relationship between Plaintiff and Defendants—premised on participation in illegal gambling activity—is therefore void ab initio.

92.     Accordingly, Plaintiff hereby voids any purported agreement or contract between himself and Defendants. As a result, Defendants may not invoke any contractual defenses—including arbitration clauses, choice-of-law provisions, or class action waivers—because no valid or enforceable agreement exists.

## FACTS SPECIFIC TO PLAINTIFF

***Plaintiff Clark's Experience***

93.    Plaintiff played RealPrize from approximately 2024 to October 2025, during which he made many in-game purchases of Gold Coins and Sweeps Coins.

94.    Plaintiff accessed RealPrize from his residence in Illinois. Plaintiff received an initial allotment of Gold Coins and Sweeps Coins. After losing his initial allocation of free Gold Coins and Sweeps Coins, he began purchasing Gold Coins and Sweeps Coins from Defendants and did so from Illinois, which Defendants accepted.

95.    Plaintiff placed all, or nearly all, of their wagers in RealPrize in Illinois.

96.    Overall, Plaintiff wagered and lost approximately $400.00 in real-world currency while using RealPrize and its games of chance. Plaintiff lost the Sweeps Coins and Gold Coins he purchased from Defendants by wagering them in RealPrize's games of chance.

97.    By and through RealPrize's gambling features described above during the time period of approximately 2024 to October 2025, Plaintiff was induced into making these purchases that he otherwise would not have made.

98.    As a result of Defendants' unfair, unlawful, and deceptive acts, Defendants were unjustly enriched.

99.    Plaintiff enjoys playing online games and has an ongoing interest in playing RealPrize if it were to change to be devoid of unlawful, deceptive and unfair business practices. Plaintiff therefore has an ongoing interest in RealPrize complying with state and federal gambling laws and consumer protection statutes.

## CLASS ALLEGATIONS

100.    Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)

on behalf of himself and all others similarly situated defined as follows:

101.    The Class is defined as follows:

**Illinois Class**: All Illinois residents who, during the applicable limitations period, have lost money wagering on Defendants' online casino games.

**Illinois Loss Recovery Subclass**: All persons in Illinois who have lost at least $50 in currency wagering on Defendants' online casino games.

102.    Collectively, the "Illinois Class" and "Illinois Loss Recovery Subclass" shall be referred to as the "Classes." Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

103.    **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class members, so joinder of all members is impracticable. The precise number of class members and their identities are unknown to Plaintiff currently but may be ascertained from Defendants' books and records and other third-party sources.

104.    **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

a.    Whether the games in RealPrize are gambling as defined under Illinois law;

b.  Whether Defendants engaged in the conduct alleged in the Complaint;

c.  Whether Defendants violate the statutes listed below in Counts I, II, and III;

d.  Whether Defendants violated statutes analogous to those alleged herein applicable;

e.  Whether and how Defendants manipulate the odds in games offered in RealPrize;

f.  Whether Plaintiff and the other Class members were damaged by Defendants' conduct; and

g.  Whether Plaintiff and the other Class members are entitled to  restitution or other relief.

105.    **Typicality**. Plaintiff's claims are typical of the claims of the Class because he was a player of RealPrize who made in-game purchases of coins and wagered such coins as a result of Defendants' unlawful and wrongful conduct. The factual and legal basis of Defendants' liability to Plaintiff and to the other Class members are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have suffered harm and damages due to Defendants' unlawful and wrongful conduct.

106.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class.

107.    **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions

or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiff and Putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the proposed Class to individually seek redress for Defendants' wrongful conduct.

108.    **Final Declaratory or Injunctive Relief.** Defendants have acted and failed to act on grounds generally applicable to the Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

**FIRST CAUSE OF ACTION**
**Violation of the Illinois Loss Recovery Act**
**720 ILCS 5/28-8**
***(On Behalf of Plaintiff and the Illinois Loss Recovery Subclass)***

109.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–108 by reference as if fully set forth herein.

110.    Plaintiff brings this count individually and on behalf of the Illinois Loss Recovery Subclass.

111.    720 ILCS 5/28-8(a) provides that:

> Any person who by gambling shall lose to any other person, any sum of money or thing of value, amounting to the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action against the winner thereof, with costs, in the circuit court.

112.    The Illinois Supreme Court has found that the "purpose of section 28-8(a) is not simply to undo illegal gambling transactions but 'to deter illegal gambling by using its recovery provisions as a powerful enforcement mechanism.'" *Dew-Becker v. Wu*, 178 N.E.3d 1034, 1037-

38  (Ill. 2020) (quoting *Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir. 1997)).

113.    Plaintiff, Illinois Loss Recovery Subclass members, and Defendants are "persons" under 720 ILCS 5/28-8(a). *See* 720 ILCS 5/2-15 ("Person" means "an individual, natural person, public or private corporation . . . partnership, unincorporated association, or other entity.").

114.    The activity of "gambling" includes anyone who, *inter alia*, "knowingly establishes, maintains, or operates an Internet site that permits a person to play a game of chance or skill for money or other thing of value by means of the Internet," 720 ILCS 5/28-1(a)(12), "knowingly plays a game of chance or skill for money or other thing of value," 720 ILCS 5/28-1(a)(1), or "knowingly . . . uses . . . any gambling device." 720 ILCS 5/28-1(a)(3).

115.    The Illinois Loss Recovery Act defines a "gambling device" as a "slot machine or other machines or device for the reception of money or other thing of value" that on "chance or skill . . . is staked, hazarded, bet, won, or lost." 720 ILCS 5/28-2(a).

116.    Defendants' Sweep Coins constitutes money or a thing of value because its value is directly tied to the U.S. Dollar at a 1:1 ratio. Just like casino chips in a brick-and-mortar casino, Sweeps Coins serves as a proxy for real currency, allowing players to wager, win, and ultimately cash out their balances in a form that retains actual monetary value.

117.    Defendants' online casino platform is an Internet site and app that permits consumers to play games of chance (e.g., online slot machines) for money or other things of value (Sweeps Coins).

118.    Every casino game offered on Defendants' online platform is a "gambling device" because they accept money or other valuable items (Sweeps Coins) from players, operate on chance using random number generators, and enable players to stake, hazard, and bet money or other valuable items (Sweeps Coins) with the potential to win or lose money or other valuable

items (Sweeps Coins).

119. Defendants' games of chance do not permit players to gamble directly against other players. Rather, like the "house" in a traditional brick-and-mortar casino, Defendants are the "winner" under the statute because they have a direct stake in the result of the gambling. When players wager Sweeps Coins on games of chance and win, they can redeem their winnings at a 1:1 ratio with the U.S. Dollar—meaning Defendants incur the equivalent monetary loss. Conversely, when players bet Sweeps Coins on games of chance and lose, Defendants retain the full value of the lost Sweeps Coins, just as traditional casinos profit from losing bets placed against the house.

120. By wagering and losing Sweeps Coins on Defendants' casino platform, Plaintiff and each member of the Illinois Loss Recovery Subclass gambled and lost money or things of value.

121. Plaintiff and the members of the Illinois Loss Recovery Subclass have each lost more than $50 gambling on Defendants' platform.

122. Defendants own, operate, and control the gambling games described herein, and directly profited from Plaintiff's and the Illinois Loss Recovery Subclass members' gambling losses. Defendants are therefore the "winner" under 720 ILCS 5/28-8(a) of all moneys lost by Plaintiff and the Illinois Loss Recovery Subclass members.

123. Defendants operate an illegal gambling website that is accessible in Illinois.

124. Plaintiff's and the Illinois Loss Recovery Subclass members' losses occurred in Illinois because Defendants' online casino games were played by Illinois residents on computers, mobile phones, and mobile devices in the State of Illinois. Defendants had actual knowledge that Plaintiff and the Illinois Loss Recovery Subclass members reside in Illinois because each of them selected "Illinois" as their state of residence and provided their complete home address pursuant

to Defendants' mandatory registration process.

125.    Plaintiff, on behalf of himself and the Illinois Loss Recovery Subclass members, seek an order requiring Defendants to (1) cease the operation of its gambling devices, and (2) return all lost monies, with costs, pursuant to 720 ILCS 5/28-8(a).

## SECOND CAUSE OF ACTION
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 ILCS §§ 505/1, *et seq.*
### *(On behalf of Plaintiff and the Illinois Class)*

126.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–108 by reference as if fully set forth herein.

127.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1, *et seq.*, bars any unlawful, unfair, or deceptive conduct in trade or commerce. This includes acts such as misrepresentation, false advertising, fraud, false promises or pretenses, and the concealment or omission of material facts.

128.    The ICFA applies to Defendants' actions and conduct as described herein because it protects consumers from transactions that are intended to result, or which have resulted, in the sale of goods or services.

129.    Defendants are each a "person" as defined by 815 ILCS 505/1(c).

130.    Plaintiff and the Illinois Class are "consumers" under 815 ILCS 505/1(e).

131.    Sweeps Coins are "merchandise" within the meaning of 815 ILCS 505/1(b) and Defendants' sale of Sweeps Coins constitutes "trade" or "commerce" within the meaning of 815 ILCS 505/1(f).

132.    Defendants' practices described above, including the operation of an illegal casino and the sale of Sweeps Coins, were unfair within the meaning of the ICFA because they constitute unlawful and unregulated gambling.

133.    Defendants' practices described above, including their operation of illegal casino platform and sale of Sweeps Coins, were unfair within the meaning of the ICFA because they, *inter alia*, offended Illinois' public policy against unlawful and unregulated gambling. *See, e.g.*, 720 ILCS 5/28-7 (Gambling contracts void); *Hall v. Montaleone*, 348 N.E.2d 196, 198 (Ill. App. Ct. 1976) (stating that "gambling contracts or contracts for an immoral or criminal purpose" are "absolutely void and unenforceable" by reason of "public policy"), and were otherwise unethical, oppressive, and unscrupulous and caused substantial injury to the consumers who purchased Sweeps Coins on the RealPrize platform.

134.    Defendants caused substantial injury to Plaintiff and the Illinois Class by inducing them to purchase and wager Sweeps Coins through the design of its illegal gambling platform and aggressive social media tactics, including that its game is not gambling. The injury caused by Defendants' conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

135.    Defendants' unfair practices occurred during the marketing and sale of Sweeps Coins for use on RealPrize's illegal gambling platform, and thus, occurred in the course of trade and commerce.

136.    Further, Defendants represent to consumers, including Plaintiff, that its games "**ARE NOT 'REAL MONEY GAMBLING'**" (emphasis in original) and you can "play for free." Plaintiff relied on these representations in playing RealPrize.

137.    Further, Defendants conceal from consumers, including Plaintiff and the Illinois Class, that wagering with Sweeps Coins on its platform constitutes illegal gambling prohibited by state law.

138.    To make matters worse, Defendants' online casino fails to provide the statutorily

required consumer protections that every licensed casino in the State of Illinois must provide to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the Illinois Gaming Board Self Exclusion Program. *See* 230 ILCS 10/13.1(a) (Compulsive gambling) ("Each licensed owner shall post signs with a statement regarding obtaining assistance with gambling problems" at "[e]ach entrance and exit" and "[n]ear each credit location."); 11 ILL. ADMIN. CODE 1800.1750.

139.    Moreover, Defendants' online casinos actively undermine critical consumer protections required by Illinois law. For example, Defendants allow anybody over the age of 18 to gamble on their casino platforms in complete disregard for the laws prohibiting individuals under the age of 21 to gamble in Illinois. *See, e.g.*, 230 ILCS 10/11(10) ("A person under age 21 shall not be permitted on an area of a riverboat or casino where gambling is being conducted . . . ."); 230 ILCS 40/40 ("No licensee shall cause or permit any person under the age of 21 years to use or play a video gaming terminal."); 230 ILCS 10/18(b)(1) ("A person is guilty of a Class B misdemeanor for . . . permitting a person under 21 years to make a wager . . . .")

140.    Rather than offering substantive assistance to players facing gambling addiction, Defendants provide only superficial and deceptive assurances about "Responsible Social Gameplay," framing any issues as a result of "social casino and promotional sweepstakes" rather than gambling addiction. *See* RealPrize, *Responsible Social Gameplay Policy*, https://realprize.com/p/responsible-social-gaming/ (last updated April 30, 2025) ("We wish to provide you with tools and information to ensure that our Contests are participated in responsibly, so that you can enjoy your experience on our Site while remaining aware of the potential risks that may be associated with ***social casino and promotional sweepstakes***.") (emphasis added).

141.    Defendants aggressively market and advertise their platform through various

28

media, including that its game is not gambling, while at the same time concealing that it is illegal under state law. As such, Illinois consumers, including Plaintiff and the Illinois Class, are highly likely to continue to encounter current and future iterations of Defendants' illegal platform absent injunctive relief.

142.    Not only is Defendants' conduct unfair, but as discussed above, Defendants' conduct is also unlawful given that they knowingly maintain and operate "an Internet site that permits a person to play a game of chance or skill for money or other thing of value by means of the Internet," 720 ILCS 5/28-1(a)(12), and otherwise knowingly play games of chance for money or other things of value, 720 ILCS 5/28-1(a)(1), and knowingly use gambling devices, 720 ILCS. 5/28-1(a)(3).

143.    Further, Defendants' conduct is immoral because it is designed to encourage illegal gambling while marketing its platform as a legal simulation of casino-style games, as well as to exploit psychological triggers associated with gambling and addiction in order to target susceptible populations.

144.    As a direct and proximate result of Defendants' conduct and violations of the ICFA, Plaintiff and the Illinois Class members have suffered harm in the form of monies paid and lost for Defendants' Sweeps Coins.

145.    Plaintiff, on behalf of himself and the Illinois Class members, seeks an order requiring Defendants to (1) cease the unfair practices described herein, (2) return all monies acquired through any purchase that included the transfer of Sweeps Coins to Plaintiff and the Illinois Class, and otherwise (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment**

*(On behalf of Plaintiff and the Illinois Class)*

146.     Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–108 by reference as if fully set forth herein.

147.     Plaintiff and the Illinois Class members have conferred a benefit upon Defendants in the form of the money they paid for the purchase of Sweeps Coins to wager on Defendants' illegal casino platform.

148.     Defendants appreciate and have knowledge of the benefits conferred upon them by Plaintiff and the Illinois Class.

149.     Under principles of equity and good conscience, Defendants should not be permitted to retain the money obtained from Plaintiff and the Illinois Class members, which Defendants have unjustly obtained as a result of its unlawful operation of casino games. As it stands, Defendants have retained millions of dollars in profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

150.     Accordingly, Plaintiff and the Illinois Class members seek full disgorgement of all money Defendants have retained as a result of the wrongful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, the following relief:

1.  For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiff as class representative and his counsel as class counsel;

2.  Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;

3.  Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages;

4. Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses;

5. Awarding pre- and post-judgment interest, as allowable by law;

6. For an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

7. Declaratory and equitable relief, including restitution and disgorgement;

8. For public injunctive relief as the Court may deem proper; and

9. Awarding such further and other relief as the Court deems just, proper and equitable.

## <u>JURY DEMAND</u>

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: October 14, 2025                                 Respectfully submitted,


By: */s/ Andrew Shamis*

**SHAMIS & GENTILE, P.A.**
Andrew Shamis (IL Bar No. 6337427)
Edwin Elliot*
14 NE 1st Ave., Suite 705
Miami, FL 33132
Telephone: 305-479-2299
ashamis@shamisgentile.com
edwine@shamisgentile.com


**EDELSBERG LAW, P.A.**
Scott Edelsberg*
Gabriel Mandler*
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Telephone: 305-975-3320
scott@edelsberglaw.com
gabriel@edelsberglaw.com


*Pro Hac Vice Forthcoming*

*Counsel for Plaintiff and the Proposed Class*